Arthur S. ROORDA, and Arthur S. Roorda, Inc. and all others similarly situated within the State of New York, Plaintiffs,

v.

AMERICAN OIL COMPANY, and Petroleum Sales & Service, Inc., Defendants.

Civ. No. 75–162.

United States District Court, W. D. New York.

Feb. 17, 1978.

Salvatore M. Latona, Latona, Worthington, Srebro & Nitterauer, Buffalo, N. Y., for plaintiffs.

Ralph L. Halpern, Raichle, Banning, Weiss & Halpern, Buffalo, N. Y., for defendant American Oil.

William J. Magavern, II, Magavern, Magavern, Lowe, Beilewech & Dopkins, Buffalo, N. Y., for defendant Petroleum.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

Defendant Petroleum Sales and Service, Inc. ("Petroleum") moved by order to show cause for summary judgment pursuant to Fed.R.Civ.P. rule 56 dismissing plaintiffs' complaint for lack of subject matter jurisdiction on the ground that such complaint fails to satisfy the jurisdictional requirement, set forth in section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), that either or any of the purchases involved in the alleged price discrimination be "in commerce". Thereafter, plaintiffs moved for leave to amend their complaint to allege, in addition to their original claim bottomed on the Robinson-Patman Act, causes of action under section 1 of the Sherman Act, 15 U.S.C. § 1, and under section 3 of the Clayton Act, 15 U.S.C. § 14.

Initially, it should be noted that the jurisdictional requirement of the Robinson-Patman Act is considerably more stringent than that contained in the Sherman Antitrust Act, 15 U.S.C. §§ 1 et seq. Under the Sherman Act, the jurisdictional interstate commerce prerequisite may be satisfied by showing either that the transactions were interstate or, if they were intrastate, that such transactions had "effects on" or "affected" interstate commerce. On the other hand, it is clear that under the Robinson-Patman Act such tests are not sufficient to bring an otherwise purely intrastate sale within the realm of interstate commerce and that a plaintiff has the burden to show that the transactions in question were in interstate commerce. This does not mean, however, that such transactions must in all cases actually cross a state line for the intrastate sale to be considered in interstate commerce. The United States Supreme Court in *Standard Oil Co. v. Federal Trade Commission,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951), adopted a "flow of commerce" test to determine whether intrastate discriminatory sales were "in commerce" within the meaning of section 2(a) of the Clayton Act, as so amended. Therein, plaintiff obtained gasoline from fields in Kansas, Oklahoma, Texas and Wyoming, refined it in Indiana and distributed it in fourteen states, including Michigan. The gasoline which plaintiff sold in the Detroit area and which was involved in the alleged discriminatory sales was transported by tankers on the Great Lakes from its refinery in Indiana to its marine terminal in River Rouge, Michigan. Sufficient gasoline was accumulated there during each navigation season to supply plaintiff's customers throughout the winter. The gasoline was stored for varying periods at the terminal or in nearby bulk storage tanks and throughout the temporary storage period was owned by plaintiff. Although plaintiff did not ship the gasoline to River Rouge pursuant to orders already taken, the demands of the Michigan market remained fairly constant and plaintiff could accurately estimate its customers' needs. Upon receipt of individual orders, plaintiff would deliver gasoline to the Detroit area from that stored at its River Rouge terminal. Based upon these facts, the Court held that the alleged discriminatory sales of gasoline in the Detroit area were "well within the jurisdictional requirements of the Act."

*Id.,* at 237, 71 S.Ct. at 243. The court further stated (at page 238, 71 S.Ct. 240) that the temporary storage of the gasoline at the terminal facilities in Michigan did not deprive the gasoline of its interstate character.

Petroleum contends that the flow of commerce doctrine has been repudiated in *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). This contention is not well taken. The United States Court of Appeals for the Second Circuit in *Great Atl. & Pac. Tea Co., Inc. v. F. T. C.,* 557 F.2d 971 (2d Cir. 1977), did not find the *Copp* case to be any impediment to application of flow of commerce principles and relied upon such doctrine to find "in commerce" jurisdiction over intrastate sales of milk. The court stated (at page 979) that:

"[T]he only remaining question is whether the Illinois-based stores' purchases from Borden were interstate transactions * * *. The Commission concluded that they were, inasmuch as Borden acquired most of its milk from Wisconsin and the raw milk was not substantially altered, chemically or otherwise, by processing at the Woodstock plant. We agree. Much as in *Foremost Dairies v. FTC,* 348 F.2d 674 (5th Cir.), *cert. denied,* 382 U.S. 959 [86 S.Ct. 435, 15 L.Ed.2d 362] (1965), a prior price discrimination action also involving fluid milk, the milk here passed 'in a steady flow from the farms in * * * [Wisconsin] through the * * * [Woodstock, Illinois] processing plant, where it underwent a rather negligible processing operation, which did not change its character appreciably, to the shelves of retail grocery establishments in * * * [the Chicago area].'"

*Copp* held that the alleged intrastate discriminatory sales of asphaltic concrete did not fall within the jurisdiction of section 2(a). The court based this conclusion on findings that the asphaltic concrete involved in such sales was made in California wholly from components produced and purchased within California and that due to its peculiar characteristics (its great weight, relatively low value and high temperature application restricted its use to within 35 miles from the hot plant where it was made), the market for asphaltic concrete was exclusively and necessarily within California. Based on these facts, the court concluded that "the alleged restraints of trade in asphaltic concrete could not be deemed within the flow of interstate commerce, despite use of the product in interstate highways." *Id.,* 419 U.S. at 192, 95 S.Ct. at 397. Thus, the court merely held that the asphaltic concrete was never in interstate commerce at any time and that its purely intrastate character precluded application of the flow of commerce theory. Such holding does not reject flow of commerce principles but, on the contrary, the court utilized such to test the jurisdictional basis of the action and found that flow of commerce did not apply on the facts before it. In addition, throughout the opinion, reference was made to the flow of commerce doctrine without any indication that its viability was being questioned or being rejected. The court (at page 195, 95 S.Ct. at page 398) specifically interpreted the "in commerce" language of section 2(a) of the Clayton Act as denoting "persons or activities within the flow of interstate commerce— the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." Furthermore, the court (at page 198, 95 S.Ct. 392, 398) clearly indicated that by its decision it was not overturning the flow of commerce doctrine but was solely refusing to adopt a nexus approach and to expand the relatively restrictive flow of commerce concept to include categories of activities which were merely connected to interstate instrumentalities. The court's citation of, and quotations from, *Hiram Walker, Inc. v. A & S Tropical, Inc.,* 407 F.2d 4 (5th Cir.), *cert. denied,* 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969), and *Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir.), *cert. denied,* 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972), were made in the context of refusing to apply an "effects on commerce" approach to section 2(a). Those cases were

relied upon to show only the consistent approach of the courts of appeals in interpreting the section as requiring either or any of the sales involved in the price discrimination to be "in interstate commerce" rather than merely having an "effect on" or "affecting" interstate commerce and not, as Petroleum contends, to demonstrate rejection of the flow of commerce doctrine.[1]

Furthermore, in addition to the decision in *Great Atl. & Pac. Tea Co., Inc.* and my interpretation of *Standard Oil* and *Copp*, the opinion in *Hampton v. Graff Vending Co.*, 516 F.2d 100 (5th Cir. 1975), indicates that the flow of commerce theory remains a viable doctrine despite any doubts expressed in *Red Apple Supermarkets, Inc. v. Deltown Foods, Inc.*, 419 F.Supp. 1256 (S.D.N.Y.1976). In *Hampton v. Graff Vending Co., supra* at 102, the court stated that:

> "Generally, if it can be shown that goods shipped from outside the state are still within the 'practical, economic continuity' of the interstate transaction at the time of the intrastate sale of goods, that latter sale will be considered 'in commerce' for purposes of the Robinson-Patman Act."

The court then noted, citing and quoting from *Walker Oil Company v. Hudson Oil Company of Missouri*, 414 F.2d 588, 590 (5th Cir. 1969), *cert. denied*, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970), that three factual situations had been recognized which, if proven by a plaintiff, would establish that goods shipped into a state would remain within the flow of commerce so as to satisfy the jurisdictional "in commerce" hurdle of section 2(a) of the Clayton Act:

> "[W]here they are purchased by the wholesaler or retailer upon the order of a customer with the definite intention that the goods are to go at once to the customer; where the goods are purchased by the wholesaler or retailer from the supplier to meet the needs of specified customers pursuant to some understanding with the customer although not for immediate delivery; and where the goods are purchased by the wholesaler or retailer based on anticipated needs of specific customers, rather than upon prior orders or contracts."

*See also, Food Basket, Inc. v. Albertson's, Inc.*, 383 F.2d 785, 788 (10th Cir. 1967). I do not read these three factual examples as comprising an exclusive list of what circumstances will satisfy the flow of commerce principle when goods are shipped from outside a state. The standard to be applied is whether such goods sent across state lines at a prior time remain within the "practical, economic continuity" of the interstate transaction at the time of the subsequent intrastate sale. The particular facts and circumstances which a plaintiff must prove to meet his jurisdictional burden will, of course, differ depending upon the economics of a particular industry such as where and how the goods are manufactured or processed, the source of the raw materials, the type of distribution and marketing system used, and the degree of control retained by the manufacturer or supplier over the ultimate terms of the sale by the wholesaler or retailer.

---

1. The Supreme Court's decisions after *Standard Oil* and before *Copp* involving alleged violations of section 2(a) did not reach the flow of commerce issue as the interstate character of either or any of the disparate sales was apparent. In *Utah Pie Co. v. Continental Baking*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), and *Federal Trade Commission v. Sun Oil Co.*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963), the sales alleged to be discriminatory were clearly in interstate commerce because the product involved was made or refined in one state and shipped across state lines by the wholesaler-supplier to the favored or disfavored retailers to consummate the sale. In *Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954), the court did not need to analyze the flow of commerce doctrine (though in dictum the court stated that interstate corporations should not be permitted to finance their intrastate price wars with interstate profits) because the facts before it plainly showed that either or any of the purchases involved in the discriminatory sales were in interstate commerce. Respondent, a corporation engaged in interstate commerce, discriminated pricewise between its customers by maintaining the price of its product in interstate transactions and contemporaneously cutting the price of goods sold to its intrastate customers.

In *Red Apple Supermarkets, Inc. v. Deltown Foods, Inc., supra,* a retail supermarket chain which operated stores in New York brought suit under section 2(a) of the Clayton Act against Kraftco Corporation ("Kraftco") and Deltown Foods, Inc. ("Deltown"), a licensee authorized by Kraftco to manufacture and distribute Light n' Lively low-fat milk in the New York City area. On defendants' motion to dismiss for failure to satisfy the jurisdictional "in commerce" requirement, plaintiff, unable to assert that any of its or its competitors' purchases of low-fat milk had crossed state lines, attempted to invoke the stream of commerce doctrine. The court assumed, though not without hesitation after the decision in *Copp,* that the flow of commerce theory remained a viable doctrine, but found that the processing in New York of Light n' Lively made a significant physical change to the raw, whole milk shipped into the state whereby such milk became merely an ingredient in the finished low-fat milk sold within New York. In accord with the factual analysis of *Red Apple* is *Scranton Construction Co., Inc. v. Litton Industries Leas. Corp.,* 494 F.2d 778, 781 (5th Cir. 1974), wherein the court stated that the "interstate movement of mere ingredients" which are then processed into a finished product in one state and sold within that state is insufficient to confer "in commerce" jurisdiction over such in-state sales.

In *Belliston v. Texaco, Inc., supra,* fifteen Texaco service station dealers in Utah filed suit against Texaco alleging, *inter alia,* that Texaco sold gasoline to a wholesaler who also operated several retail service stations at a price less than charged to plaintiffs in violation of section 2(a) of the Clayton Act. All of the gasoline sold and distributed by Texaco to its dealers in Utah was purchased by Texaco from American Oil Company which had refined the gasoline at its facilities in Utah from crude oil shipped via pipeline from other states. The court held that the refinement of gasoline in Utah precluded application of the flow of commerce theory because the character of the crude oil had been so changed by the highly technical refinement process that the resultant gasoline was in effect a new product which did not retain the interstate characteristics of the unrefined crude oil.

■ In *McGoffin v. Sun Oil Co.,* 539 F.2d 1245 (10th Cir. 1976), a retail service station dealer alleged that the defendant sold gasoline to another service station dealer who was one of plaintiff's secondary line competitors (both stations being located approximately two miles apart on the same highway in Oklahoma) and that this price discrimination between them violated section 2(a). Defendant moved to dismiss the discriminatory price claims alleging that none of the discriminatory purchases was in interstate commerce because the gasoline sold by defendant to the competing service stations was refined in Oklahoma and that any sales of gasoline to plaintiff or his competitor by defendant were made solely within the State of Oklahoma. The court held that jurisdiction was lacking under section 2(a) because the gasoline in question was refined in Oklahoma and the sales involved in the discrimination were also made there. The flow of commerce theory was not available to plaintiff and thus, in order to meet the "in commerce" requirement, plaintiff would have had to prove that either or any of the discriminatory sales had crossed state lines, which he was unable to do. Similarly, the court in *Bacon v. Texaco, Inc.,* 503 F.2d 946 (5th Cir. 1974), held the flow of commerce theory to be unavailable to plaintiff because the gasoline in question was refined within the same state as the alleged discriminatory sales and thus there was never any interstate commerce from which a flow of commerce could be derived. In *Borden Company v. F. T. C.,* 339 F.2d 953 (7th Cir. 1964), appellant's alleged discriminatory sales of milk to grocery stores in Portsmouth and New Boston (both in Ohio) were found to be beyond the jurisdiction of section 2(a) because the negotiations for such sales took place in Ohio and the milk was produced, processed and delivered to customers in Ohio for resale in Ohio. *See, also, Central Ice Cream Co. v. Golden Rod Ice Cream Co.,* 287 F.2d 265 (7th Cir.), *cert. denied,* 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d

32 (1961). On the other hand, the flow of commerce doctrine may be applied to confer jurisdiction where a finished product is shipped into a state from elsewhere and is resold substantially unchanged within that state either immediately or after temporary storage. *Standard Oil Co. v. Federal Trade Commission, supra; Dean Milk Co. v. Federal Trade Commission,* 395 F.2d 696, 715 (7th Cir. 1968); *Foremost Dairies, Inc. v. Federal Trade Commission, supra* at 678.

■ In the present case, some of the gasoline purchased and sold by Petroleum to plaintiffs and their competitors was refined by defendant American Oil Company ("Amoco") at its Tonawanda, New York facilities.[2] Such a situation is factually analogous to the gasoline refined and sold within Utah in *Belliston,* the ice cream made and sold within Illinois in *Central Ice Cream,* the Light n' Lively low-fat milk made and distributed within New York in *Red Apple,* and the milk produced, processed and sold within Ohio in *Borden.* As to this gasoline refined within New York, the flow of commerce theory is not applicable because said gasoline was never in interstate commerce prior to its purchase by Petroleum and all subsequent sales by it were within New York. With respect to this gasoline, plaintiff's inability to allege that either or any of the sales by Petroleum involved in the price discrimination crossed state lines is jurisdictionally fatal because as to gasoline refined within the same state as the alleged discriminatory sales the stream of commerce theory is not available to confer "in commerce" jurisdiction. *See, Great Atl. & Pac. Tea Co., Inc. v. F. T. C., supra* at 979–80 (fn. 7).

■ With respect to the gasoline allegedly refined in Texas City, Texas and shipped via pipeline to Amoco's terminal facilities in New York, and purchased and sold by Petroleum in New York, the flow of commerce theory may be invoked by plaintiffs to attempt to satisfy the stringent jurisdictional requirements of section 2(a) and obviates the need to establish that either or any of the sales involved in the discrimination crossed state lines. Because application of the flow of commerce doctrine turns upon the particular facts and circumstances of each case, plaintiffs should be permitted the opportunity to prove at trial that Petroleum's sales within New York of gasoline refined outside the state were within the "practical, economic continuity" of the prior interstate transaction so that subsequent intrastate sales retained their interstate character. *See, Perry v. Amerada Hess Corp.,* 427 F.Supp. 667 (N.D.Ga.1977). Therein, the court denied as premature defendant's motion to dismiss plaintiffs' claims bottomed on section 2(a) on the ground that none of the sales involved in the discrimination took place "in commerce". The court found (at page 671) that plaintiffs may well have been able to prove a set of facts which would support their theory that the gasoline in question remained continually in interstate commerce from the time it was shipped from refineries located outside Georgia and Florida (the locations of plaintiffs' retail service stations) until it was subsequently sold at the retail level by plaintiffs to consumers.

Petroleum places heavy reliance on *Hiram Walker, Inc. v. A & S Tropical, Inc., supra.* In that case, a Florida retail liquor

---

**2.** Plaintiffs have attached to their motion papers an unsigned stipulation allegedly prepared by defendants into which plaintiffs say they will enter prior to trial. Therein, it is stated that during 1974 and 1975 approximately 20% of the regular gasoline stored at Amoco's Tonawanda terminal facility was refined in Texas City, Texas and shipped via pipeline to said storage facility. All regular gasoline stored at such facility during 1971 through 1973 and 80% of the regular gasoline stored in 1974 and 1975 was refined in Tonawanda, New York. It is further stated that between April 1971 and April 1975 all premium grade gasoline stored at such terminal facility was refined in Texas City, Texas and transferred to said storage facility by pipeline. Defendants have not questioned the accuracy of the facts set forth in the proposed stipulation and have proceeded in their papers and at oral argument as if such were the case. Under these circumstances, it appears that some of the gasoline in question was refined in Texas and some was refined within New York during the periods pertinent to the instant action.

store proprietor brought suit under section 2(a) against the manufacturer of alcoholic beverages (or more precisely an affiliated corporation of the manufacturer who was its exclusive sales agent) and two Florida distributors who purchased liquor from the manufacturer, stored it in warehouses in Florida for varying periods of time, and then resold and distributed it to retail stores in Florida. The court pointed out that the manufacturer did not sell directly to retail stores and did not assert any control or establish any terms and conditions of resale. The court held that under these circumstances the interstate manufacturer could not be held liable as a seller within the meaning of section 2(a) under the so-called "indirect purchaser" doctrine. With respect to the two Florida distributors, the court found that the undisputed facts showed that they sold only to retail customers within Florida. The court held that under such circumstances there was "no merit" to the contention that the sales by the distributors within Florida were in interstate commerce for purposes of section 2(a). The court reasoned that discriminatory sales made by an autonomous local distributor to different customers located in the same state as the distributor were beyond the jurisdictional reach of the section. Similarly, in a prior case, *Abramson v. Colonial Oil Company*, 390 F.2d 873 (5th Cir. 1968) (per curiam), the owners of a service station in Florida alleged that Colonial Oil Company ("Colonial"), a Florida corporation which supplied at wholesale petroleum products to independent dealers and sold petroleum products at retail through its own service stations, discriminated against them by selling petroleum products to other service stations at lower prices in violation of section 2(a). The court found that during the period in question all retail service stations in the pertinent geographic area of Florida which purchased petroleum products from Colonial, including plaintiffs' station, were supplied with petroleum products which Colonial had purchased within Florida. Based solely upon this finding, the court summarily dismissed plaintiffs' complaint for lack of jurisdiction.

These cases are factually distinguishable from the case at hand. The intrastate distributors in *Hiram Walker* and *Colonial* were autonomous. There was no interrelationship between them and the interstate supplier. The supplier did not exert any control or establish any terms and conditions of resale. Because of this autonomy, the stream of commerce had come to an end when the local distributors purchased the product from the supplier who had previously shipped its product into the state. As such purchases were made intrastate, the subsequent sales by the local distributors within the same state were not "in commerce". Thus, *Hiram Walker* and *Colonial* merely held that the stream of commerce came to rest and ceased to flow when goods are purchased intrastate by an autonomous local distributor. In the present case, there are factual issues with respect to the exact relationship between Petroleum and Amoco which can only be resolved at trial. Furthermore, the three factual situations outlined in *Hampton* which if proven would establish a flow of commerce need to be explored to determine whether they apply to the present case. Because it cannot be said as a matter of law that jurisdiction is lacking, summary judgment is precluded. Petroleum's motion for summary judgment, therefore, is hereby denied.

A motion for leave to amend a complaint is addressed to the sound discretion of the court. *Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 814 (2d Cir. 1960). Fed. R.Civ.P. rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Unless the proposed amendment to the complaint will result in undue prejudice, has been unduly delayed, has not been offered in good faith or the moving party has had repeated opportunities to cure defects by amendments previously allowed, leave to amend should be liberally granted. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Defendants contend that plaintiffs' motion should be denied because plaintiffs' delay in seeking leave to amend

has been unreasonable and that they would be substantially prejudiced if such were granted. Lack of diligence is justification for refusing to grant leave to amend where the delay is unreasonable. *Wheeler v. West India S. S. Co.,* 205 F.2d 354 (2d Cir. 1953). Where there has been lack of diligence, the burden is on the moving party to demonstrate that the delay was due to oversight, inadvertence or excusable neglect. *Freeman v. Continental Gin Company,* 381 F.2d 459, 469 (5th Cir. 1967). In *Weight Watch. of Quebec Ltd. v. Weight W. Int., Inc.,* 398 F.Supp. 1047, 1056 (E.D.N.Y.1975), wherein the plaintiff filed a cross-motion for leave to amend the complaint in response to defendant's motion for summary judgment, it was held that plaintiff had failed to meet its burden to make a clear showing that the amendment relates to a still viable claim, will not unnecessarily complicate the litigation or prejudice the defendant, is offered in good faith and was not unduly delayed.

Defendants rely on *Kirby v. P. R. Mallory & Co., Inc.,* 489 F.2d 904, 912 (7th Cir. 1973). Therein, plaintiff originally alleged violations of section 2 and then sought leave to amend his complaint to assert a claim under section 3 of the Clayton Act. It was held not to have been an abuse of discretion for the district court to deny plaintiff's motion for leave to amend when such motion did not contain any facts unknown to plaintiff 2½ years earlier and was not made until after defendant's motion for summary judgment and in anticipation of an adverse ruling. To allow an untimely amendment where plaintiff was aware of all facts long before his motion to amend was filed and which would materially alter the basis for the action and would necessitate additional discovery, conferences, pre-trial orders and statements was held to be unfair. In *Komie v. Buehler Corporation,* 449 F.2d 644, 647–48 (9th Cir. 1971), the Court of Appeals in affirming the trial court's denial of a motion for leave to amend noted that the proposed amendment was not based upon any facts not previously known by the movant and was sought after considerable delay. Another court held that leave to amend should not be granted after pretrial matters had been completed unless compelling reasons were presented. *Nevels v. Ford Motor Company,* 439 F.2d 251, 257 (5th Cir. 1971). In *McGoffin v. Sun Oil Co., supra,* at 1248, the court in upholding the district judge's decision not to permit plaintiff to amend his complaint stated that plaintiff should not be allowed to amend where such amendment would restructure his case by asserting a new theory of recovery necessitated by difficulty encountered in satisfying threshold jurisdictional prerequisites.

■ In the instant case, plaintiffs commenced this action April 28, 1975 and, after the parties had acknowledged their readiness, trial was set for April 11, 1977. Thereafter, in response to defendants' motion filed March 29, 1977 for summary judgment to dismiss the complaint for lack of subject matter jurisdiction, plaintiffs on March 30, 1977, eleven days prior to trial and twenty-three months after their complaint was filed, moved for leave to amend their complaint. The amendment sought by plaintiffs does not amend their initial cause of action by correcting the alleged jurisdictional defect, but proposes to add two new causes of action. Notwithstanding plaintiffs' contention in their memorandum of law to the contrary, the other causes of action based upon section 1 of the Sherman Act and section 3 of the Clayton Act are sufficiently distinct from the claim set forth in the original complaint that proof to be adduced at trial as to the original claim will be different in character from that required to be adduced to establish the proposed new causes of actions. In addition, these proposed causes of action would require additional discovery because different elements are required to be proved and the discovery to date has focused solely on alleged price discrimination violative of section 2(a) of the Clayton Act. Furthermore, plaintiffs' moving papers show that the proposed amendments are not based on facts and evidence unearthed during the discovery process but that the same were known to plaintiffs at the time this action was commenced. It is also evident that plaintiffs

have sought leave to amend because of their anticipation of a possible adverse ruling as to the jurisdictional foundation of their original claim. However, as previously noted, plaintiffs do not seek to amend their original cause of action on this jurisdictional issue. Plaintiffs have unduly delayed in seeking leave to add these additional causes of action and have not demonstrated that such delay should be excused. Defendants have completed discovery solely focusing on the alleged violation of section 2(a) of the Clayton Act and are ready to proceed to trial. Defendants would be unduly prejudiced if leave to amend were granted under these circumstances. Plaintiffs ought not be permitted to circumvent the jurisdictional requirements of their initial cause of action by asserting at this late date two separate and additional causes of action. Plaintiffs' motion for leave to amend their complaint to add the two additional causes of action is hereby denied.

Plaintiffs' motion to leave to amend the *ad damnum* clause of their complaint to $300,000 in actual damages stands on a different footing. Defendants merely argue that they have proceeded on the assumption that maximum actual damages in the case would be $50,000 and that defense counsel's preparation, strategy and tactics might have been different if the increased amount of damages sought were known earlier. This argument is not well taken. In the federal courts, the amount of damages found by a jury is not limited to that amount set forth in the complaint as the requested relief. Fed.R.Civ.P. rule 54(c); *Couto v. United Fruit Co.,* 203 F.2d 456, 457 (2d Cir. 1953). In *Goldenberg v. World Wide Shippers & Mov. of Chicago,* 236 F.2d 198, 200 (7th Cir. 1956), the court termed as "completely ridiculous" the defendant's argument that, if the amendment were granted, he would have only a short time to prepare the defense of a suit which had been increased from $60,000 to $100,000. It was emphasized that increasing the amount of damages sought did not change a single issue in the case and that defendant had had almost two years to discover the specific damages for which plaintiffs could recov-

er. In *Varveris v. United States Lines Company,* 141 F.Supp. 874, 875 (S.D.N.Y. 1956), the court, in granting leave to amend the complaint to increase the amount of damages sought, held that "[P]rejudice * * does not flow from proper exposure to the damages proved." Plaintiffs' motion for leave to amend the complaint to increase the *ad damnum* clause to $300,000 in actual damages is hereby granted.

So ordered.