Charles ZOSLAW and Jane Zoslaw, husband and wife, d/b/a Marin Music Centre, Plaintiffs,

v.

MCA DISTRIBUTING CORP., et al., Defendants.

No. C–75–0007 RFP.

United States District Court, N.D. California.

Sept. 4, 1984.

Maxwell Keith, Oakland, Cal., for plaintiffs. .

Rene P. Tatro, Heller, Ehrman, White & McAuliffe, Jack W. Londen, Morrison & Foerster, Jeffrey Williams, Morgenstein, Ladd & Jubelirer, Alf R. Brandin, Lillick, McHose & Charles, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER RE MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE CLAIMS FOR DAMAGES

PECKHAM, Chief Judge.

### INTRODUCTION

This lengthy antitrust dispute has involved many claims against many different defendants. Most of the claims have already been resolved, but certain Robinson-Patman allegations remain undecided. Defendants Warner/Elektra/Atlantic Corp. ("WEA"), Polygram Distribution, Inc. ("Polygram"), and MTS, Inc. ("MTS") have now moved for summary judgment on the Robinson-Patman claims against them. WEA and Polygram have also moved to strike plaintiffs' claims for damages. This memorandum and order discusses and disposes those motions.

### FACTS

Plaintiffs Charles and Jane Zoslaw are the former operators of Marin Music Centre, a retail store in Marin County that sold records, tapes, and related items. The store commenced operations in 1965, and went out of business in 1977.

The Zoslaws filed this lawsuit in 1975. It was originally assigned to the late Chief Judge Emeritus George Harris, but was reassigned to this court in July of 1978. Among the numerous defendants were several record distributors, including WEA, Polygram, ABC Records, Inc. ("ABC"), and MCA Distributing Corp. ("MCA"). In their complaint, the Zoslaws alleged that the record distributors had violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling records and tapes to retail chain stores at lower prices than those offered to single outlet stores, such as Marin Music Centre. Plaintiffs also claimed that the distributors had violated sections 2(d) and 2(e) of the Act, 15 U.S.C. §§ 13(d) and 13(e), by discriminating in favor of retail chain stores in granting promotional allowances and furnishing special services. Finally, Mr. and Mrs. Zoslaw charged the distributors with violations of the Sherman Act.

The Zoslaws also brought Sherman Act claims against a record retailer, MTS. They further accused MTS of violating sections 2(d), 2(e), and 2(f) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d), 13(e), and 13(f), by knowingly inducing and receiving the alleged discriminations in price and other terms, allowances, and services.

After allowing extensive discovery, this court granted motions for summary judgment on behalf of MTS, WEA, Polygram, ABC, and MCA. See *Zoslaw v. Columbia Broadcasting System*, 533 F.Supp. 540, 556 (N.D.Cal.1980), aff'd in part and rev'd in part, 693 F.2d 870 (9th Cir.1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983); *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 875-76 (9th Cir.1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Plaintiffs appealed those adverse rulings to the Ninth Circuit.

The Ninth Circuit affirmed this court's disposition of the Sherman Act claims, but reversed the judgments in favor of WEA, Polygram, ABC, and MCA on the Robinson-Patman Act claims. See *Zoslaw*, 693 F.2d at 874. The Ninth Circuit also reversed the decision in favor of MTS on the claim under section 2(f) of the Robinson-Patman Act. See *id.* at 882. The Court of Appeals did, however, sustain this court's determination that there was no merit to plaintiffs' claims against MTS under sections 2(d) and 2(e) of the Robinson-Patman Act. See *id.* at 882 n. 15.[1]

1. The Ninth Circuit also concluded that this court acted properly in ruling that the occasion-

In reversing this court's rulings on the Robinson-Patman claims against WEA, Polygram, ABC, and MCA, the Ninth Circuit explained that this court had used an improper test in deciding whether the jurisdictional prerequisite of the Robinson-Patman Act was met. *See id.* at 876–80. Understanding that ruling requires familiarity with the basic principles of Robinson-Patman jurisdiction.

 "To prove jurisdiction under section 2(a) of the Robinson-Patman Act, a plaintiff must demonstrate (1) that the defendant is 'engaged in interstate commerce;' (2) that the price discrimination occurred 'in the course of such commerce;' and (3) that 'either or any of the purchases involved in such discrimination are in commerce.'" *Id.* at 877. The jurisdictional "in commerce" language in section 2(a) is not as broad as the "affecting commerce" language in the Sherman Antitrust Act. *See Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). In particular, the "purchases ... in commerce" requirement limits the section's application to cases "where 'at least one of the two transactions which, when compared generate a discrimination, ... cross[es] a state line.'" *Id.* at 200, 95 S.Ct. at 401. If goods from out-of-state are still within the "practical, economic continuity" of an interstate transaction at the time of an intrastate sale, the latter sale is considered "in commerce" for purposes of the Robinson-Patman Act. *See Zoslaw,* 693 F.2d at 877.

In determining whether the sales of records in *Zoslaw* were within the "practical, economic continuity" of an interstate transaction, this court relied on an intent test, which dictated that the flow of commerce ends when goods reach their intended destination. *See id.* at 877–78. Under that test, "goods leave the stream of commerce when they are stored in a warehouse or storage facility for general inventory purposes, that is, with no particular customer's needs in mind." *Id.* at 878. This

court held that WEA, Polygram, ABC, and MCA stocked their California warehouses for general inventory purposes, and thus that the subsequent sales to Bay Area retailers were not in the flow of commerce. *See id.*

But the Ninth Circuit concluded that the court's focus on intended destination was misplaced. *See id.* at 878–79. Relying on a Supreme Court decision, *Standard Oil Co. v. FTC,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951), it asserted that "interstate producers of goods produced out-of-state do not meaningfully interrupt the flow of commerce by simply storing them in the state of eventual sale." *Zoslaw,* 693 F.2d at 879. Accordingly, it held that purchases of records and tapes from the California warehouses of ABC and MCA were "in commerce," because ABC and MCA manufactured those items out-of-state and simply stored them in California before selling them to retailers. *See id.* at 879.

It did not decide, however, whether purchases from the WEA and Polygram California warehouses were "in commerce." *See id.* at 879–80. Rather, it noted that "WEA and Polygram did not themselves manufacture records, but they were wholly owned subsidiaries of companies engaged in record and tape production." *Id.* at 879. It then asserted that "[s]ales to subsidiaries do not necessarily remove such transactions from Robinson-Patman jurisdiction." *Id.* It explained that in deciding whether a sale to a subsidiary meaningfully interrupted the flow of commerce, a court must examine "the extent to which the subsidiaries acted as independent distributors in their pricing and marketing decisions, in effect, breaking the flow of commerce between the manufacturer and the local retailer." *Id.* at 880. Because this court had not conducted such an examination, the Ninth Circuit reversed the grants of summary judgment in favor of WEA and Polygram. *Id.*

al drop sales (instances in which California record distributors arranged for out-of-state manufacturers to deliver records and tapes directly to local retailers) were *de minimis* and and therefore would not support Robinson-Patman jurisdiction. *Zoslaw,* 693 F.2d at 880–81.

After the Ninth Circuit discussed the Robinson-Patman claims against ABC, MCA, WEA, and Polygram, it turned to this court's ruling on the section 2(f) claim against MTS. It concluded that the court was correct in holding that MTS could not be liable under section 2(f) unless the distributors were liable under section 2(a). *See id.* at 882. But because it had reversed the judgments in favor of the distributors under section 2(a), it also reversed this court's ruling on the section 2(f) claim against MTS. *See id.* The Ninth Circuit then devoted the remainder of its opinion to analysis and rejection of plaintiffs' Sherman Act claims. *See id.* at 882–90.

Mr. and Mrs. Zoslaw, unhappy with the Ninth Circuit's resolution of their Sherman Act claims, appealed to the Supreme Court. But the Court denied their petition for certiorari. *See Zoslaw v. MCA Distributing Corp.,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Thus, the Sherman Act claims were fully adjudicated, and only Robinson-Patman allegations were remanded to this court.

Following remand, MTS, WEA, and Polygram brought new motions for summary judgment. WEA and Polygram have also moved to strike the plaintiffs' claims for damages. The court has received extensive briefing on those motions, has heard lengthy oral argument, and has carefully considered the contentions of the parties. It analyzes the issues as set forth below.

## LEGAL ANALYSIS

### I. *Motions for Summary Judgment*

#### A. *Arguments based on lack of jurisdiction.*

##### 1. *WEA's argument for summary judgment on ground that there is no Robinson-Patman jurisdiction because WEA is an independent distributor.*

Undaunted by the Ninth Circuit's ruling that this court erred in granting WEA summary judgment for lack of Robinson-Patman jurisdiction, WEA again seeks summary judgment on that basis. It contends that it has established as a matter of law that it functioned as an independent distributor in its pricing and marketing decisions, and thus that there is no jurisdiction under the test that the Ninth Circuit propounded on appeal. In support of that argument, it has submitted considerable information about its corporate structure and functioning.

But in the text of its *Zoslaw* opinion, the Ninth Circuit, after describing the jurisdictional test, declared that "[s]uch threshhold issues of jurisdiction are *normally questions of fact for the jury to resolve.*" 693 F.2d at 880 (emphasis added). More importantly, the court specifically asserted that "it appears that there are *genuine issues of material fact in dispute*" regarding resolution of the status of WEA and Polygram. *Id.* (emphasis added). The Ninth Circuit repeated as much in a footnote, stating that in *Zoslaw,* in contrast to *United States v. American Building Maintenance,* 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975) (a Clayton Act case involving purchases from *unaffiliated* in-state distributors of goods manufactured out-of-state), "there is *a legitimate question of material fact* whether the record retailers were in fact insulated from interstate commerce by WEA or Polygram." 693 F.2d at 880 (emphasis added).

Thus, the Ninth Circuit's *Zoslaw* opinion included language clearly indicating that summary judgment in favor of WEA or Polygram for lack of Robinson-Patman jurisdiction would be improper. The court did not specify, however, which of the evidence before it provided the basis for its determination that there were disputed issues of material fact regarding the independence of WEA and Polygram.

Yet WEA's own evidence demonstrates that there is sufficient factual information before this court to support a verdict in favor of the plaintiffs on the question of Robinson-Patman jurisdiction over WEA. On a motion for summary judgment, the court must view the evidence and the inferences that may be drawn there-

from therefrom in the light most favorable to the party opposing the motion. *Johnson v. Mateer,* 625 F.2d 240, 242 (9th Cir.1980); *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 759 (9th Cir.1980); *Stansifer v. Chrysler Motors Corp.,* 487 F.2d 59, 63 (9th Cir.1973). In support of its summary judgment motion, WEA has submitted a declaration executed by Henry Droz, the president of WEA. In that declaration, Mr. Droz reveals that he and representatives from each of the three record manufacturing companies whose records WEA distributes sit on a committee that meets quarterly to consider WEA's important pricing decisions. Declaration of Henry Droz, filed 8/15/83, at ¶ 32. He further states that each member of the committee has one vote. *See id.* A jury believing that information could reasonably infer that WEA was subject to the desires of the record manufacturing companies in making its pricing decisions. Admittedly, Mr. Droz also alleges that WEA has veto power over any of the committee's pricing decisions. But because this court must consider the evidence in the light most favorable to the plaintiffs, it cannot give credence to that evidence in ruling on WEA's motion for summary judgment. The court therefore rejects WEA's argument that it has shown as a matter of law that it was an independent distributor. It is not entitled to summary judgment on that basis.

> 2. *Polygram's argument for summary judgment on ground that there is no Robinson-Patman jurisdiction because Polygram is an independent distributor.*

Like WEA, Polygram contends that it is entitled to summary judgment because it was an independent distributor. In support of that argument, it has submitted a declaration of Sterling Devers, a vice president of an affiliate of Polygram. In his declaration, Mr. Devers asserts that during the years at issue Polygram "controlled completely all decisions relating to the price at which records and tapes were sold to its customers." Declaration of Sterling C. Devers, filed 8/15/83, at ¶ 5. He also states that Polygram "controlled completely all decisions relating to billing, credit and collection with respect to its customers." *Id.* at ¶ 7. His comments, if believed, would establish, or at least go a long way towards establishing, that Polygram was an independent distributor under the Ninth Circuit's jurisdictional test.

But his declaration is not the only evidence before this court, and the Ninth Circuit's comments about the existence of a genuine dispute of material fact pertained to Polygram as well as WEA. Although the evidence that supports plaintiffs' jurisdictional argument seems considerably weaker than that in favor of Polygram, there is not such a dearth of evidence as to warrant summary judgment.

From the evidence in the record, it appears that Polygram was a several-tiers-removed subsidiary of a company that had other several-tiers-removed subsidiaries that sold records to Polygram.[2] *See* Declaration of Arnold Rich, filed 3/29/84. The record manufacturers that were affiliated with Polygram and sold records and tapes to Polygram included Phonogram, Inc. and Polydor, Inc. *See id.* at ¶ 4. One of the pieces of evidence that plaintiffs have submitted is an advertisement that asserts: "In major markets recording, manufacturing, distribution and data processing for *Phonogram* and *Polydor* is *carried out by* national *Phonodisc* organizations." Declaration of Maxwell Keith Re Polygram Summary Judgment Motion, filed 12/1/83, at Exhibit 3 (emphasis added). Phonodisc is a former name of Polygram, *see Zoslaw,* 693 F.2d at 874 n. 1, and thus the statement in the advertisement could be interpreted as an admission that Phonogram and Polydor controlled both record manufacturing operations and the distribution activities of Polygram.

---

**2.** The Ninth Circuit apparently was unaware of Polygram's precise status when it decided *Zoslaw,* believing that Polygram was a wholly owned subsidiary of a record manufacturing company. *See* 693 F.2d at 879.

The plaintiffs have also submitted evidence showing that officers of Polygram and members of Polygram's Board of Directors have simultaneously held positions in record manufacturing companies affiliated with Polygram. *See, e.g.,* Declaration of Maxwell Keith Re Polygram Summary Judgment Motion, filed 12/1/83 at Exhibit 14, p. 4 (Sterling Devers was Regional Marketing Manager for Polydor, Inc.); Declaration of Sterling Devers, filed 8/15/83, at 1–2.(Devers held management positions in Polygram). Such overlap is to be expected where subsidiary relationships exist, but it provides a basis, albeit a weak one, from which a jury could infer that Polygram's pricing and marketing decisions were subject to the desires of those who also controlled the out-of-state production of the records that Polygram distributed. Per-. haps it was simply such evidence, or even just Polygram's status as an affiliate of out-of-state record companies, that convinced the Ninth Circuit that the issue of whether there is Robinson-Patman jurisdiction over Polygram's sales should go to the jury.

Finally, the plaintiffs have submitted a number of agreements between Polygram and various companies involved in the record business. For example, they have presented an August 4, 1972 agreement between Polygram and Polydor, which provided that "Polydor shall determine a list price or prices for its products as well as all procedures for special sales campaigns and all sales conditions." Declaration of Maxwell Keith Re Polygram Summary Judgment Motion, filed 12/1/83, at Exhibit 4, p. 15. The list prices are the prices that retailers are encouraged to charge their customers, not the prices that Polygram is to charge the retailers. But the evidence that Polydor controlled the list prices suggests that Polydor might also have controlled Polygram's prices. That inference

is weakened by the noninclusion in the agreement of a provision explicitly giving Polydor the right to control Polygram's prices. There is, however, a clause requiring Polygram to pass on to its customers any price reduction that Polydor gives to Polygram. *See id.* That information, combined with the preceding ·information and other evidence in the record,[3] would be sufficient to support a finding that Polygram's pricing decisions were not independently made. Thus, plaintiffs have presented enough evidence to preclude summary judgment on the question of whether there is Robinson-Patman jurisdiction over Polygram's sales.

3. *WEA and Polygram's argument for partial summary judgment on ground that there is no Robinson-Patman jurisdiction over records manufactured in California.*

In addition to contending that the court should fully dispose of the claims against them for lack of Robinson-Patman jurisdiction, WEA and Polygram have raised a second, more limited,. jurisdictional argument. They maintain that they are entitled to partial summary judgment because (1) most of the records and tapes they distributed in California were also manufactured in California, (2) records and tapes manufactured and distributed in California are never "in commerce," and thus (3) there is no Robinson-Patman jurisdiction over sales of those records and tapes.

In making that argument, both WEA and Polygram have presented evidence regarding the place of manufacture of the products they distributed in California during the years covered by plaintiffs' complaint. Specifically, WEA has shown that all of the albums and tapes it sold in California were manufactured in California, except the Nonesuch line of classical recordings, Warner Bros. tapes, and Atlantic tapes. *See* Decla-

**3.** For example, the agreement between Polygram and Polydor provides: "Polydor shall bear the expenses for special promotional campaigns undertaken at Polydor's sole request; however, · Polydor shall be the sole judge of whether such campaigns shall be undertaken and shall con- trol the method of such campaigns." Declaration of Maxwell Keith Re Polygram Summary Judgment Motion, filed 12/1/83, at Exhibit 4, p. 11. That clause suggests that Polydor had input in an a measure of control over Polygram's marketing practices.

ration of Henry Droz, filed 8/15/83, at ¶s 4–5. Similarly, Polygram has demonstrated that, with the exception of certain tape recordings from Omaha and the Polydor line of classical records, all of the records and tapes it sold in California were produced in California. *See* Declaration of Sterling Devers, filed 12/30/77, at ¶ 7. Plaintiffs have submitted no contradictory evidence, so the success of defendants' argument for partial summary judgment hinges on the validity of the legal proposition that the records and tapes manufactured and distributed in California were never "in commerce" within the meaning of the Robinson-Patman Act.

In advancing that proposition, WEA and Polygram have pointed out that in *Gulf Oil Corp.*, 419 U.S. at 200, 95 S.Ct. at 401, the Supreme Court held that the "in commerce," requirement is met only if one of the purchases involved in the price discrimination crosses a state line. Sales of records and tapes manufactured in the state where sold would not seem to meet that test, so *Gulf Oil Corp.* lends support to defendants' position.

A further and very compelling authority favoring WEA and Polygram is *Roorda v. American Oil Co.*, 446 F.Supp. 939 (W.D.N.Y.1978). In *Roorda*, a company sold gasoline, 20% of which was refined out-of-state, and 80% of which was refined in-state. Robinson-Patman claims were brought against the company, but the court ruled that there was no Robinson-Patman jurisdiction over the gasoline manufactured in-state. The court explained that the "stream of commerce theory [was] not available to confer 'in commerce' jurisdiction" over the gasoline refined intrastate, because that gasoline never entered the stream of commerce. *Id.* at 945. *Roorda* thus demonstrates that where a distributor handles a product that is manufactured out-of-state and a product that is manufactured in-state, Robinson-Patman jurisdiction exists only over the product that is manufactured out-of-state.[4] Applying that rule to the instant case dictates that there is no Robinson-Patman jurisdiction over sales of the records and tapes that were produced in California. Moreover, WEA and Polygram have a stronger case than that in *Roorda*, because the products manufactured out-of-state were separate lines of albums and tapes, not gasoline that was commingled with gasoline produced within the state. Consequently, it is clear that WEA and Polygram are entitled to partial summary judgment for lack of jurisdiction: They cannot be held liable for any transactions that involved records and tapes that were manufactured in California.[5]

4. *S & M Materials v. Southern Stone Co.*, 612 F.2d 198 (5th Cir.1980), *cert. denied*, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980), and *Cream Crest-Blanding Dairies, Inc. v. National Dairy Products Corp.*, 243 F.Supp. 331 (W.D. Mich.1965), *aff'd*, 370 F.2d 332 (6th Cir.1967), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2051, 18 L.Ed.2d 990 (1967), also establish as much. Both of those cases involved distributors that handled a product manufactured in-state and a different product manufactured out-of-state. As in *Roorda*, the courts held that there was no Robinson-Patman jurisdiction over sales of the products manufactured in-state. *See S & M Materials*, 612 F.2d at 200; *Cream Crest*, 243 F.Supp. at 333–34.

5. The only case that plaintiffs cite in opposition to defendant's request for partial summary judgment is *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). In that case, a seller alleged that another seller had used a discriminatory pricing scheme for two products and had thereby injured the plaintiff. The Ninth Circuit held that the defendant seller's interstate sales of its two products (sales in Nevada of products manufactured in California) were sufficient to confer Robinson-Patman jurisdiction over all of its sales of those products, both interstate and intrastate. *See id.* at 1044.

But *Inglis* differs from the instant case in two important respects. First, it was a primary line case (*i.e.*, one in which a seller was complaining about the tactics of another seller). Thus, the jurisdictionally relevant sales were all of the defendant seller's sales of the products at issue. *Zoslaw*, in contrast, is a secondary line case (*i.e.*, one in which a buyer alleges that a seller is discriminating in favor of another buyer). In such a case, the only jurisdictionally relevant sales are the defendants' sales to the competing buyers. It is entirely irrelevant whether WEA and Polygram sold the same products in other states, and the Ninth Circuit noted as much in its *Zoslaw* opinion. *See* 693 F.2d at 880 n. 13.

4. *MTS' argument for partial summary judgment based on success of jurisdictional arguments of WEA and Polygram.*

■ MTS contends that to the extent that WEA and Polygram succeed on their jurisdictional arguments, this court must grant partial summary judgment to it on the section 2(f) claims against it for receiving discriminatory prices from WEA and Polygram. That is a correct statement of the law. *See Zoslaw,* 693 F.2d at 882. Thus, because the court has decided to grant partial summary judgment for lack of jurisdiction in favor of WEA and Polygram, it also grants partial summary judgment in favor of MTS on that basis.

B. *WEA's nonjurisdictional arguments for summary judgment.*

1. *Argument for summary judgment on ground that WEA has established the good faith meeting competition defense.*

■ WEA claims that it is entitled to summary judgment because its price discrimination between single outlet stores and chain retailers was a good faith effort to meet competition. Section 2(b) of the Robinson-Patman Act, 13 U.S.C. § 13(b), creates this affirmative defense. When proved, the good faith meeting competition defense "exonerates a seller from Robinson-Patman Act liability." *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 438, 103 S.Ct. 1282, 1290, 75 L.Ed.2d 174 (1983). The Supreme Court "consistently has held that the ... defense 'at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.'" *Id.; see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

In support of its meeting competition defense, WEA again refers to the declaration of Henry Droz. Towards the end of that declaration Mr. Droz states that when WEA entered the record distributing market in 1971, each of the other principal sellers of records, including CBS, MCA, RCA, and Capitol, already employed a system of price discrimination among purchasers performing different functions. *See* Declaration of Henry Droz, filed 8/15/83, at ¶ s 42–43. Mr. Droz's declaration further asserts that the existence of such systems was common knowledge throughout the record industry, and was openly discussed by potential customers and trade publications. *See id.* at ¶ 42. Finally, Mr. Droz declares that WEA's adoption of such a system was based on its analysis of how it could best penetrate the market. *See id.*

Plaintiffs have presented no evidence convincingly refuting those assertions. Moreover, in *Zoslaw,* the Ninth Circuit commented:

> The appellees presented sufficient evidence of legitimate business decisions to justify their actions. For example, WEA justified its two tier account classification system between "subdistributors" and "retailers" as a means of meeting the competition of those distributors who had previously entered the market and who maintained multiple tier account classifications.

693 F.2d at 884. Similarly, this court commented in its *Zoslaw* opinion that "the only plausible inference from the record is that defendants acted in response to competition and in a manner intended to meet competition. 533 F.Supp. at 553.

■ But those statements were made in the context of discussing the plaintiffs' Sherman Act conspiracy claim of conscious parallelism, an issue on which the Zoslaws had the burden of proof. *See Zoslaw,* 693

---

The second important difference between *Inglis* and the instant case is that *Inglis* involved both interstate and intrastate sales of *the same products.* Here, in contrast, the products manufactured out-of-state were entirely distinct from those manufactured in-state. Thus, contrary to plaintiffs' assertions, *Inglis* is wholly inapposite.

F.2d at 884. In contrast, the burden in the context of the meeting competition defense is on the defendant to "establish that the *evidence supported only one reasonable conclusion*—that its lower prices were a good faith response to competition." *Inglis*, 668 F.2d at 1045 (emphasis in original). The Ninth Circuit has been very stringent in interpreting that standard.

For example, in *Inglis*, it denied summary judgment on the basis of the meeting competition defense, even though its doubt about the validity of the defense was "admittedly small" and "[t]he weight of the evidence [supported the defendant's] claim that its price reductions were good faith responses to competition." 668 F.2d at 1047, 1048. It explained that the defendant's failure to employ verification procedures (rigorous methods of verifying that any discounts in its prices were offered in response to equally low discounts offered by competitors)[6] was "not inconsistent with the type of aggressive price reductions condemned by the Robinson-Patman Act." *Id.* at 1047. Thus, the court was not persuaded that the theory that the defendant's actions were a good faith attempt to meet competition "was the only reasonable conclusion possible." *Id.* For that reason, summary judgment was inappropriate.

■ To this court's chagrin, WEA has not even attempted to discuss, much less distinguish, *Inglis*. Nor has it presented any evidence that it made a practice of employing verification procedures in setting its prices. Its silence on the matter perhaps reflects realization that *Inglis* cannot be effectively distinguished. Even if WEA believes otherwise, this court is convinced that *Inglis* is controlling, and thus that WEA is not entitled to summary judgment on the basis of the meeting competition defense.

2. *WEA's argument for partial summary judgment on ground that WEA did not discriminate in advertising.*

■ WEA's final argument for summary judgment relates only to plaintiffs' section 2(d) and 2(e) claims for discrimination in advertising during the years 1972 to 1974. It contends that it is entitled to summary judgment on those claims because it did not discriminate against Marin Music Centre in granting advertising allowances during the relevant period.

In support of that argument, it has submitted an affidavit executed by Russell Vail, and comparing the total advertising allowances that WEA gave to each of the chains of record retailers that purchased records from WEA in California during the years 1972 to 1974. Affidavit of Russell Vail, filed 8/15/83. It expresses the results in terms of percentage of purchases. The three-year average for Marin Music Centre is 4.25%, which is comparable to the 4.57% for Integrity stores and the 4.28% figure for Tower stores, and is well above the 2.54% branch average. Thus, Mr. Vail's declaration shows that WEA did not discriminate against Marin Music Centre in granting advertising allowances during the period from 1977 to 1974.

The plaintiffs have submitted what they argue is contradictory evidence, but in fact it is not. For example, they have submitted an exhibit which they claim shows that Tower received 7.49% of its net purchases as an advertising allowance. *See* Declaration of Maxwell Keith Re Summary Judgment Motion, filed 12/1/83, at Exhibit 8, p. 6. But in calculating that 7.49% figure the plaintiffs have compared the advertising allowance *for the entire Tower chain in California* with the purchases *for only some* of Tower's California stores, thus arriving at an artificially inflated figure. *See* Supplemental Declaration of Russell Vail, filed 1/27/84, at 2–3. Because the Zoslaws have failed to present competent evidence contradicting the figures shown in Russell Vail's affidavit, the court must grant summary judgment for WEA on the section 2(d) and section 2(e) claims for discrimination in advertising during the years 1972 to 1974.

---

**6.** For a description of the verification methods used in *Inglis, see* 668 F.2d at 1046 nn. 55 & 56.

C. *MTS' nonjurisdictional arguments for summary judgment.*

1. *Argument for summary judgment on ground that plaintiffs have not shown substantial injury to competition.*

■ MTS maintains that this court should grant summary judgment in favor of it because the plaintiffs have failed to show that there is "a reasonable possibility" that the price difference between single outlet stores and chain stores "may harm competition." *Falls City*, 103 S.Ct. at 1288. Such a showing is a prerequisite to recovery under section 2(a) of the Robinson-Patman Act, *see id.*, and thus essential to recovery against MTS under section 2(f), *see Zoslaw*, 693 F.2d at 882.

■ "The naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination 'may' substantially lessen competition; the test must always focus on injury to competition." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 548 (9th Cir.1983). Thus, the business failure of Marin Music Centre is not enough to meet the requirement; there must instead be a showing of harm or potential harm to the competitiveness of the Marin County record market.

■ A showing of a reasonable possibility of harm is sufficient, however. Section 2(a) "does not require that the discriminations must *in fact* have harmed competition." *Falls City*, 103 S.Ct. at 1288 (emphasis added).

The Supreme Court has held that the existence of a reasonable possibility of injury to competition "is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Falls City*, 103 S.Ct. at 1289; *see also FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). That rule is known as the *"Morton Salt* rule." *See Falls City*, 103 S.Ct. at 1289. A substantial price discrimination within the scope of the rule appears to have existed in *Zoslaw*, and thus the rule seems to dictate

that the Zoslaws have made a prima facie showing of potential harm to competition.

MTS argues, however, that the *Morton Salt* rule does not apply where developments subsequent to the discriminatory pricing events demonstrate that no harm to competition actually occurred. In other words, it claims that if there is post hoc evidence showing an absence of injury to competition, a court must conclude that no reasonable possibility of injury to competition existed at the time of the events giving rise to the lawsuit. Its briefing in support of that proposition is thoughtful and carefully researched. But it is not able to cite any Robinson-Patman case that clearly endorses the rule it espouses.

■ More importantly, however, the court need not decide whether to adopt MTS' theory, because MTS has not conclusively shown that no injury to competition occurred in the instant case. It has merely submitted excerpts from the advertising sections of the Marin County and San Francisco telephone books. *See* Declaration of Jack W. Londen, filed 8/16/83. Those excerpts show that the number of record retailers listed in the advertising sections increased, rather than decreased, from 1971 to 1982. *See id.* at 2. But MTS has presented no evidence demonstrating that the number of records listed in the advertising sections of the telephone books correlates with the actual number of record retailers in Marin County and San Francisco. Further, showing that the number of record retailers has increased in recent years is not the same as proving that MTS' activities while the Zoslaws were in business did not injure competition. There remains the possibility that the harmful effect of MTS' activities was simply outbalanced by factors tending to stimulate competition within the record retail industry (such as an increase in the population of San Francisco and Marin County). Without evidence negating that possibility, this court would not be warranted in concluding as a matter of law that MTS' activities during the relevant period were not injurious to competition. Accordingly, even if

the court were to agree that post hoc evidence can override the *Morton Salt* rule, it would not be justified in awarding summary judgment to MTS for lack of injury to competition.[7]

### 2. *Argument for summary judgment on ground that plaintiffs have not shown that MTS caused any injury.*

██ MTS' last argument for summary judgment starts with the well-established proposition that plaintiffs in Robinson-Patman cases have standing only to complain of acts that are injurious to their own competitive positions. *See M.C. Mfg. Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1066 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Texas Gulf Sulphur Co. v. J.R. Simplot Co.,* 418 F.2d 793, 805 (9th Cir.1969). From that proposition, MTS properly concludes that the Zoslaws could have standing to complain of MTS' acts of receiving favorable treatment only if MTS and Marin Music Centre were competitors in the same market. MTS then alleges that it was not a competitor of Marin Music Centre, and thus it is entitled to summary judgment.

██ In support of its claim that it did not compete with Marin Music Centre, MTS refers to Russell Solomon's declaration, in which Mr. Solomon reveals that MTS has never had a record store in Marin County. *See* Declaration of Russell Solomon, filed 8/16/83, at ¶ 1. Mr. Solomon

---

7. In a letter submitted after the court heard oral argument on MTS' motion for summary judgment, MTS has offered two new reasons for finding that the Zoslaws have failed to satisfy the requirement of injury to competition. Neither of those arguments is persuasive.

MTS' first new argument relies on a recent Federal Trade Commission opinion, *In re General Foods Corp.,* 3 Trade Reg.Rptr. (CCH) ¶ 22,-142 (April 6, 1984) (F.T.C. Docket 9085), to show that the test for impact on competition under section 2(a) of the Robinson-Patman Act is identical to the test for the "dangerous probability of success" element of a claim of attempted monopolization under section 2 of the Sherman Act. After stating that principle, MTS claims that the Ninth Circuit's *Zoslaw* opinion held that the Sherman Act "dangerous probability of success" element was not satisfied. MTS therefore concludes that the Robinson-Patman Act requirement of injury to competition also is not satisfied.

The problem with MTS' reasoning is that the Ninth Circuit, unlike the Federal Trade Commission, has recently stated that the Robinson-Patman Act *differs* from the Sherman Act in that "the offense of attempted monopolization requires proof of a dangerous probability of success while section 2(a) of the Robinson-Patman Act requires *only* a showing that the price discrimination 'may' substantially lessen competition." *Inglis,* 668 F.2d at 1042 (emphasis added). This court must follow the guidance of the Ninth Circuit, so it cannot adopt MTS' view that the Ninth Circuit's assessment of the Zoslaws' Sherman Act claim precludes recovery on their Robinson-Patman Act claims.

MTS' second new argument is similar to its first. In that argument, it cites *Black Gold, Ltd. v. Rockwool Industries, Inc.,* 729 F.2d 676 (10th Cir.1984), for the proposition that the standard for injury to competition under the Robinson-Patman Act is identical to the "unreasonable restraint on trade" standard under the Sherman Act. MTS then contends that because the Ninth Circuit has already determined that the Zoslaws have not shown "unreasonableness" within the meaning of the Sherman Act, the Zoslaws necessarily are also unable to demonstrate injury to competition within the meaning of the Robinson-Patman Act.

The flaw in that argument is that although the language in *Black Gold* about the identity of standards is broad, the holding of that case is more limited. The court simply ruled that if plaintiffs have failed to satisfy the Robinson-Patman standard, they necessarily have also failed to meet the Sherman Act "unreasonableness" requirement. That is not the same as saying that if the plaintiffs cannot show "unreasonableness," they also cannot establish Robinson-Patman liability. The Robinson-Patman standard may be less demanding than the Sherman Act "unreasonableness" requirement. Indeed, the Ninth Circuit's comparison of the Robinson-Patman standard and the Sherman Act "dangerous probability of success" requirement, *supra,* suggests as much. Further, if the "unreasonableness" standard were in fact identical to the Robinson—Patman requirement of injury to competition, it seems improbable that the Ninth Circuit would have remanded the Zoslaws' Robinson-Patman claims to this court for further proceedings. Yet the Ninth Circuit did remand those claims and, in discussing the Sherman Act "unreasonableness" requirement, it noted that the Sherman Act aims it was considering were inconsistent with the goals of the Robinson-Patman Act. *See Zoslaw,* 693 F.2d at 887. Accordingly, this court is unconvinced by MTS' argument that the Ninth Circuit's Sherman Act ruling on "unreasonableness" precludes recovery under the Robinson-Patman Act. MTS is not entitled to summary judgment on that basis.

admits, however, that MTS has had stores in San Francisco and Berkeley. *See id.* But he asserts that those stores could not have deprived Marin Music Centre of any appreciable amount of business, because they are far away from Marin County and differ in character from Marin Music Centre. *See id.* Mr. Solomon's declaration thus lends credence to MTS' assertion that it was not a competitor of Marin Music Centre.

The Zoslaws have, however, submitted evidence suggesting the opposite conclusion. In particular, Mr. Zoslaw has executed a declaration in which he reports that "[a] large number of customers in the Marin Music store told me that Marin's prices were too high and they could buy the product at a much lower price at [MTS] or the Wherehouse." Declaration of Charles Zoslaw, filed 12/1/83, at 12. MTS contends that statement is hearsay, which it clearly is. But its hearsay nature simply means that it cannot be used to prove the truth of the matter asserted (*i.e.*, that plaintiffs' customers could buy records for lower prices at MTS and the Wherehouse than at Marin Music Centre). The hearsay rule does not prevent the statement from being used for other purposes, such as to prove that plaintiffs' customers were aware of MTS' existence and wished to bring MTS to Mr. Zoslaw's attention. From those facts, a jury would be justified in inferring that MTS was in competition with Marin Music Centre.

Moreover, other portions of Mr. Zoslaw's declaration would, if believed, bolster such an inference. For example, Mr. Zoslaw asserts that while he was commuting from his Oakland home to Marin Music Centre in Mill Valley, he often heard radio advertisements for MTS. *See id.* The occurrence of such advertising on a prolonged basis within the Mill Valley area suggests that MTS was attracting customers from that area. Mr. Zoslaw's decision to reduce his prices to meet those of MTS, coupled with the resultant increase in the volume of his business, *see id.* at p. 13, also strengthens plaintiffs' claim that MTS was in competition with Marin Music Centre.

Thus, it is clear that a genuine factual dispute exists regarding whether MTS deprived Marin Music Centre of an appreciable amount of business. Resolution of that dispute is a matter for the jury to decide, so the court is unable to grant MTS' motion for summary judgment.

## II. Motion of WEA and Polygram to Strike Plaintiffs' Claims for Damages

### A. Alleged speculativeness of plaintiff's claims for damages.

WEA and Polygram not only seek summary judgment, but have also moved to strike plaintiffs' claims for damages. They allege that those claims are too speculative to be recoverable.

In making their motion to strike, WEA and Polygram have stressed that although joint and several liability exists in Sherman Act cases, it does not exist under the Robinson-Patman Act. Rather, a defendant in a Robinson-Patman Act case is responsible in damages only to the extent that the plaintiff's "injury was attributable *to the [defendant's]* price discrimination ...." *Falls City,* 103 S.Ct. at 1290 (emphasis added); *see also Shreve Equipment, Inc. v. Clay Equipment Corp.,* 650 F.2d 101, 105 (6th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 997 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).

WEA and Polygram have also emphasized that courts are not to award automatic damages in Robinson-Patman cases—*i.e.*, damages that (1) are awarded simply upon proof that a price discrimination violating the Robinson-Patman Act occurred, and (2) are in the amount of the illegal price discrimination. In explaining that such damages are unavailable, WEA and Polygram have repeatedly referred to the portions of a recent Supreme Court case, *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68

L.Ed.2d 442 (1981), in which the Supreme Court clearly announced that principle.

■ But they have not discussed the remainder of that opinion, which is much less favorable to their motion to strike plaintiffs' claims for damages. After holding that Robinson-Patman plaintiffs cannot invoke automatic damages but must demonstrate actual injury to recover, the Court clarified that once a plaintiff meets the burden of showing the existence of injury, "relaxed damage rules" apply. *Id.* at 567, 101 S.Ct. at 1929–30. The plaintiff need not present precise proof of the amount of injury, but need only submit evidence from which the magnitude of damages may be justly and reasonably inferred. *Id.* at 565, 101 S.Ct. at 1929.

The Court's "willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land.". *Id.* at 566, 101 S.Ct. at 1929. As the Court has commented, damages issues in these cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," because "[t]he vagaries of the marketplace usually deny ... sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Id.* at 565, 566, 101 S.Ct. at 1929 (quotation marks within opinion omitted).

The Court's leniency in the calculation of damages also stems from its well-founded belief that "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *Id.* at 566–67, 101 S.Ct. at 1929 (quotation marks within opinion omitted). The Court has explained:

> [A]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

*Id.* at 566, 101 S.Ct. at 1929, *quoting Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

The rule relaxing proof of the amount of damages thus not only is a firmly established legal principle, but also is based on important policy considerations. Determining whether the rules applies in the instant case requires assessment of whether the Zoslaws have presented sufficient evidence to support a finding that defendants' price discrimination caused injury to Marin Music Centre.

■ The Zoslaws' theory of damages is that if they had not been subject to price discrimination, they could have and would have lowered their prices, which would have resulted in increased sales and profits. There is evidence before the court that tends to support that theory. First, it is undisputed that WEA and Polygram discriminated against the Zoslaws by offering merchandise to other distributors at lower prices than were given to the Zoslaws.[8]

---

8. During certain years, Polygram did not discriminate against the Zoslaws to the same extent as other record distributors did: Polygram had a three-tier pricing structure, and it placed Marin Music Centre in the mid-priced tier rather than in the highest-priced tier. *See* Memorandum of Polygram in Support of Motion to Strike Plaintiffs' Damages Claim, filed 1/20/84, at Attached Exhibits (Depositions of Emile Petrone, Charles Zoslaw, and Jane Zoslaw). In 1975, however, Polygram switched Martin Music Centre to the highest-priced tier, which was for single-outlet retailers. *Id.*

In its brief in support of its motion to strike plaintiffs' claims for damages, Polygram emphasizes that while the Zoslaws received favorable prices from Polygram, they "did not charge any less for records purchased from [Polygram] than they charged for records purchased from other distributors, despite the lower price they were receiving from [Polygram]." *Id.* at 4. Polygram contends that the Zoslaws' failure to charge less for Polygram's records demonstrates that, contrary to the Zoslaws' theory of damages, the Zoslaws would not have lowered their prices had they not been subject to price discrimination. That clearly is a permissible infer-

*See, e.g.*, Memorandum of Polygram Distribution in Support of Motion to Strike Plaintiffs' Damages Claims, filed 1/20/84, at 2–3. Second, it is also clear that at least some of the distributors that received favored price treatment had lower retail prices than Marin Music Centre. *See, e.g.*, Declaration of Charles Zoslaw, filed 12/1/83, at 12. Third, it is uncontested that Marin Music Centre went out of business in 1977. Finally, and most importantly, plaintiffs have introduced evidence suggesting the existence of a causal connection between defendants' price discrimination and the failure of Marin Music Centre. Specifically, plaintiffs have presented evidence that when Marin Music Centre lowered its retail prices in 1974 to those of MTS, Marin Music Centre's sales volume increased substantially, but its gross profit margin per record decreased and it sustained losses. *See id.* at 13; WEA Motion in Limine to Strike Plaintiffs' Damages Claims, filed 12/12/83, at Charles Zoslaw Exhibit 10. From that evidence, a jury permissibly could infer that if Marin Music Centre had been able to obtain its products at a lower price from the defendants, it would have decreased its own prices, sold more records and tapes, and sustained increased profits. *Cf. Bigelow*, 327 U.S. at 258–59, 66 S.Ct. at 577 (plaintiff presented evidence comparing its profits attained during the antitrust violation with its profits for the period immediately preceding the violation).

Thus, there is sufficient evidence in the record to support a finding that plaintiffs suffered actual injury as a result of defendants' price discrimination. Consequently, the court must use the Supreme Court's relaxed damage standard in assessing plaintiffs' calculations of the amount of damages attributable to each defendant.

"However, even under a relaxed burden of proof, there must be a rational basis by which a jury can assess the amount of antitrust damages or the award cannot

stand." *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 995 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). "Even though the burden of proving damages is lessened by the fact of antitrust violation and injury, the plaintiff is still required to put forth substantial relevant evidence." *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575 (5th Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

In the instant case, Mr. Zoslaw's damage calculations are complicated and difficult to follow. But the plaintiffs have submitted extensive documentary evidence, including such data as Marin Music Centre's sales figures for the years 1966 to 1974, *see* WEA Motion in Limine to Strike Plaintiffs' Damages Claim, filed 12/12/83, at Charles Zoslaw Exhibit 10, prices that WEA and Polygram charged Marin Music Centre, MTS, and other stores, *see, e.g.*, Declaration of Charles Zoslaw, filed 12/1/83, at 8 & Exhibit 2, and retail price figures, *see, e.g.*, Declaration of Maxwell Keith Re WEA Summary Judgment Motion, filed 12/1/83, at Keith Exhibit 1. Moreover, although apportioning damages among the defendants clearly would be a difficult task, comparisons of percentages of purchases and magnitudes of price discrimination could be used to obtain estimates of the harm attributable to each defendant. Thus, the court is not prepared to hold at this time that plaintiffs' claims for damages are too speculative to be recoverable. Should it become clear during the course of trial that there is no reasonable basis upon which a jury could base an award or awards of damages, the defendants may seek reconsideration of this ruling.

B. *Alleged unavailability of damages for future profits and goodwill value.*

█ In addition to contending that the court should strike plaintiffs' damage

---

ence from plaintiffs' pricing of Polygram's records. But deciding whether to draw that inference is a question for the jury, not this court. Consequently, the evidence regarding

plaintiffs' pricing of Polygram's records in no way compels the court to grant defendants' motion to strike plaintiffs' claims for damages.

claims as overly speculative, WEA and Polygram have pressed a second damage claim argument, which relates only to damages allegedly accruing after Marin Music Centre went out of business in 1977. Plaintiffs maintain that defendants' price discrimination was responsible for the closure of Marin Music Centre, and thus that they are entitled to recover as damages the value that Marin Music Centre would have had on its closing day had it not been subject to price discrimination. They have approximated that value by calculating (1) the amount of profits they allegedly would have earned from 1977 to 1991 through purchasing defendants' products at nondiscriminatory prices and reselling those products, and (2) the goodwill value that Marin Music Centre allegedly would have had in 1991. WEA and Polygram strenuously argue, however, that "[n]either future profits, 'going concern' value, or 'goodwill' value may be recovered under the Robinson-Patman Act." WEA Motion in Limine to Strike Plaintiffs' Damages Claim, filed 12/12/83, at v.

In advancing that proposition, WEA and Polygram principally rely on a recent district court decision, *Stevens v. Zenith Distributing Corp. of Kansas*, 568 F.Supp. 1200 (W.D.Mo.1983). But *Stevens* is clearly distinguishable from the case at hand. In *Stevens*, the plaintiff purchased products from the defendants at allegedly illegal discriminatory prices for several years, but then elected to avoid defendants' discriminatory pricing by purchasing similar products from other suppliers. *Id.* at 1201. The plaintiff later brought suit, seeking damages under the Robinson-Patman Act not only for injuries allegedly resulting from the purchases he had made at discriminatory prices, but also for profits from purchases he claimed he would have made if the defendants had not practiced price

discrimination. *Id.* But the court concluded that he could not recover the latter type of damages. *Id.* at 1201–02. In so ruling, the court simply followed a long line of cases holding that a claim for damages under the Robinson-Patman Act must be directed towards remedying the harm attributable to an actual sale at a discriminatory price, not injury resulting from a sale that never occurred. *Id.* at 1201.[9]

Allowing the Zoslaws to obtain damages for the value Marin Music Centre allegedly would have had in 1977 absent defendants' price discrimination would not be inconsistent with that principle. The Zoslaws' request for such damages represents an attempt to obtain a remedy for harm caused by actual sales, not potential sales. That is clear from the theory on which their claim for such damages is based: the allegation that illegal price discrimination on their pre-1977 purchases forced them out of business and deprived them of the opportunity to earn profits from 1977 forward. Because the Zoslaws are seeking a remedy for injury attributable to actual, not hypothetical, price discrimination, *Stevens* is inapposite and in no way precludes recovery. Indeed, the court in *Stevens* carefully explained that it was not dealing with a claim for "constructive termination of [a] distributorship." *Id.*

Further, there are Robinson-Patman cases in which courts have permitted recovery of damages for injury to the going concern value of a business that was subjected to price discrimination. *See, e.g.*, *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 110 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *Atlas Bldg. Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 958–59 (10th Cir.1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4

---

9. For examples of cases holding that potential purchasers may not recover damages, see *M.C. Mfg. Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1065 (5th Cir.1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Chatham Brass Co., Inc. v. Honeywell, Inc.*, 512 F.Supp. 108, 113–14 (S.D.N.Y.1981); *J.W. Burress, Inc. v. JLG Industries, Inc.*, 491 F.Supp. 15, 17–19 (W.D.

Va.1980); *Republic Packaging Corp. v. Haveg Industries, Inc.*, 406 F.Supp. 379, 381 (N.D.Ill. 1976). For a case adopting the contrary view, see *American Can Co. v. Bruce's Juices, Inc.*, 187 F.2d 919, 924 (5th Cir.), *modified on other grounds*, 190 F.2d 73 (5th Cir.), *cert. dismissed*, 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951).

L.Ed.2d 1727 (1960). WEA contends that those cases are distinguishable because they are primary line cases, not secondary line cases. In a primary line case, the price discrimination claim is brought by a competitor of the defendant. In contrast, in a secondary line case, like the instant one against WEA and Polygram, the claim is brought by one of the defendant's customers. WEA maintains that the reason for allowing recovery of going concern value in a primary line case is because the defendant has illegally reaped its competitor's profits through price discrimination and should not be permitted to retain those profits. WEA then argues that that rationale does not apply to a secondary line case because "in a secondary line case the defendant did not seek or gain plaintiff's profits." WEA Reply Memorandum in Support of Motion in Limine to Strike Plaintiffs' Damages Claim, filed 2/3/84, at 4.

But WEA is mistaken in presuming that the only rationale for awarding damages for going concern value is to force defendants to give up what they have wrongfully earned. A second, and equally compelling, reason for awarding such damages is to ensure that plaintiffs are fully compensated for harm they have sustained as a result of illegal price discrimination. That rationale applies to secondary line cases as forcefully as to primary line cases, and dictates that going concern value should be available as a remedy in both types of cases. Accordingly, the court will not strike the Zoslaws' claims for money they allegedly would have been able to earn had they not been forced out of business in 1977 by price discrimination. Defendants' argument that such damages are unavailable simply is not persuasive.

## CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that the motion to strike plaintiffs' claims for damages is denied.

IT IS FURTHER ORDERED that defendants' motions for summary judgment are denied, except that the court grants:

1. Partial summary judgment for WEA, Polygram, and MTS based on lack of jurisdiction over records manufactured and sold in California, and

2. Summary judgment for WEA on plaintiffs' section 2(d) and 2(e) claims for discrimination in advertising during the years 1972 to 1974.